# In the United States Court of Federal Claims

<table>
<tr><td>

COSETTE PHARMACEUTICALS, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

</td><td>

No. 25-cv-279

Filed Under Seal: October 31, 2025

Publication: November 17, 2025[1]

</td></tr>
</table>

*Travis L. Mullaney* of ArentFox Schiff LLP, Washington, D.C. argued for Plaintiff. With him on the briefs were *Kevin Pinkney*, *Richard J. Webber*, and *Aida Al-Akhdar* of ArentFox Schiff LLP, Washington, D.C.

*Mikki Cottet* of the United States Department of Justice, Civil Division, Washington, D.C. argued for Defendant. With her on the briefs were *Yaakov M. Roth, Patricia M. McCarthy* and *William J. Grimaldi* of the United States Department of Justice, Civil Division, Washington, D.C., and *Jennifer Claypool* and *Jason Fragoso* of the United States Department of Veterans Affairs.

## MEMORANDUM AND ORDER

This action is a bid protest concerning the Department of Veterans Affairs' (VA's or Government's) efforts to procure prasugrel, a blood thinner used to reduce the risk of heart attacks and strokes. In this case, the VA seeks to obtain a lower-cost, generic version of the drug because the brand-name version of prasugrel—manufactured by Plaintiff Cosette Pharmaceuticals, Inc. (Cosette or Plaintiff)—is significantly more expensive. In procuring the drug, however, the VA must comply with federal law which mandates, with discrete exceptions, that the drug be

---

[1] This Memorandum and Order was filed under seal on October 31, 2025, in accordance with the Protective Order entered in this case. ECF No. 43. On November 14, 2025, the parties filed a Notice proposing redactions to the Memorandum and Order. ECF No. 45. The sealed and public versions of this Memorandum and Order are identical, except for some redactions, this footnote, and the addition of the publication date.

manufactured in the United States or certain approved countries.  In particular, the Trade

Agreements Act of 1979, 19 U.S.C. §§ 2501 et seq., (TAA) constrains the agency's choices.  The

statute prohibits federal agencies from purchasing products manufactured in certain countries,

unless, as relevant to this action (i) no statutorily-compliant alternative is offered, or (ii) the

compliant alternatives are "insufficient" to fulfill the Government's requirements.  19 U.S.C.

§ 2512(a)(2).  Despite receiving a TAA-compliant offer from Cosette, which manufactures its

prasugrel in Germany,[2] a compliant country under the TAA, the VA nevertheless awarded the

contract to Golden State Medical Supplies, Inc. (Golden State), which manufactures its generic

version of prasugrel in India, a non-compliant country under the TAA.  Cosette challenges that

award here, contending that since it submitted the only TAA-compliant offer, the VA was bound

by law to (i) award Cosette the contract for the supply of prasugrel, (ii) procure the drug via the

current Federal Supply Schedule contract with Cosette, or (iii) cancel the Solicitation and procure

a generic form of prasugrel on the open market.  In contrast, despite the TAA's prohibition on

purchasing products manufactured in India, the VA contends that the award to Golden State is

nevertheless permissible under one of the TAA's above-referenced statutory exceptions because

Cosette's significantly higher price rendered its offer "insufficient to fulfill the requirements of the

United States Government."  *See* ECF No. 29 at 29 (Def. MJAR); 19 U.S.C. § 2512(a)(2)(B).

---

[2] Cosette performs its final manufacturing in Germany, while its active pharmaceutical ingredient (API) comes from Japan.  ECF No. 27 at 12 (Plaintiff's Motion for Judgment on the Administrative Record).  Under the TAA's definition, a product comes from the last country where "it has been substantially transformed."  19 U.S.C. § 2518(4)(B).  Cosette acknowledges that the manufacture of the API (rather than the final manufacture) has historically been the country of the last substantial transformation but argues that the place of final manufacture "may also be relevant." ECF No. 27 at 12 n.1.  As both Germany and Japan are TAA-compliant countries, the parties do not dispute that Cosette's prasugrel is TAA-compliant.  *See* ECF No. 29 at 15 (Defendant's Cross-Motion for Judgment on the Administrative Record).

Resolution of this dispute turns on whether an offer is "insufficient" under the TAA if it would impose significantly greater expenses on the agency (i.e., Cosette's offer) than would an otherwise non-TAA-compliant alternative (i.e., Golden State's offer). In urging the Court to rule in its favor, the VA advances many policy rationales, many of them seemingly well-founded; however, it is evident that Congress opted not to write such a "high price" exception into the plain text of the TAA. However much the VA may prefer a lower price—and however laudable the VA's policy reasons to protect the public fisc may be—the agency is bound to the framework Congress enacted. The VA must comply with the TAA when making its award decision, and this Court is similarly bound to interpret laws as enacted by Congress, regardless of any compelling policy rationales the VA advances to the contrary.

Accordingly, for the reasons described below, Cosette's Motion for Judgment on the Administrative Record (ECF No. 27) is **GRANTED IN PART** and the VA's Cross-Motion for Judgment on the Administrative Record (ECF No. 29) is **DENIED IN PART**.

## BACKGROUND

### I.    Statutory and Regulatory Context

Two relevant statutes limit the Government's ability to purchase goods originating abroad. *Acetris Health, LLC v. United States*, 949 F.3d 719, 722-23 (Fed. Cir. 2020). The first, the Buy American Act of 1933 (BAA), 41 U.S.C. §§ 8301-8305, was enacted during the Great Depression "to create jobs for American workers and protect American industry." *United States v. Rule Indus., Inc.*, 878 F.2d 535, 538 (1st Cir. 1989). The BAA requires federal agencies to acquire "only manufactured articles, materials, and supplies that have been manufactured in the United States," unless the head of the procuring agency determines that doing so would be inconsistent with the

public interest, would result in unreasonable cost,[3] or that suitable domestic products are not available in sufficient quantity or quality.  41 U.S.C. § 8302(a)(1).

As noted, this bid protest turns in large part on the construction and application of the second statute, the Trade Agreements Act of 1979, 19 U.S.C. §§ 2501 et seq., and its implementing regulations.  The Trade Agreements Act of 1979 was enacted in part to implement the United States' commitments under international trade agreements, including the World Trade Organization Government Procurement Agreement (WTO GPA)—a multilateral trade agreement that requires signatory countries to open government procurement markets to one another on equal and nondiscriminatory terms.  19 U.S.C. § 2502.  The WTO GPA prohibits its signatories from discriminating against goods and suppliers from other signatory countries, meaning that foreign-country signatories may not discriminate against American-made products, and the United States may not discriminate against products originating in those countries.  The text of the TAA describes two purposes: first, "to provide appropriate reciprocal government procurement opportunities to United States products and suppliers,"; and second, to "encourage additional countries to become parties to" the agreement.  19 U.S.C. § 2512(a)(1).  To achieve the first aim, the TAA authorizes the President to waive the BAA's domestic preference requirements for procurements covered by the WTO GPA, thereby allowing agencies to consider offers from designated countries[4] on equal terms with U.S.-made products.  *Id.*  To accomplish the second

---

[3] FAR 25.106 sets forth mechanical rules to define an "unreasonable cost" for domestic end products under the BAA.  Under FAR 25.106(b)(1), when the restrictions of the BAA apply, and the domestic offer is not the low offer, then the contracting officer adds either 20% or 30% to the price of the non-domestic low offer.  If the price of the domestic offer remains higher than the adjusted low offer, then the domestic offer is deemed unreasonable.  *Id.*

[4] While signatories to the WTO GPA form the core of designated countries, the set of TAA-compliant countries also includes: parties to the United States-Mexico-Canada Agreement, non-major-industrial countries that do not discriminate against American-made products in government

objective, the TAA imposes a strict limitation: for procurements covered by the WTO GPA, agencies may only acquire products from the United States or a designated country. 19 U.S.C. § 2512(a)(1)(A). In other words, Congress barred agencies from purchasing goods from non-designated countries to incentivize other countries to join the WTO GPA or to otherwise open their procurement markets to U.S. suppliers. This prohibition applies unless one of two statutory exceptions is satisfied: (i) there are no offers of a U.S.-made or designated country product; or (ii) such offers are "insufficient to fulfill the requirements of the United States Government."[5] 19 U.S.C. § 2512(a)(2). Significantly, unlike the BAA, the TAA contains no explicit exception based on price. *Compare* 41 U.S.C. § 8302(a)(1) (BAA), *with* 19 U.S.C. § 2512(a)(2) (TAA).

The Federal Acquisition Regulations (FAR) subpart 25.4 implements the TAA. For acquisitions covered by the WTO GPA, FAR 25.403(c)(1) directs contracting officers to "acquire only U.S.-made or designated country end products," unless offers for such products are "either *not received* or are *insufficient* to fulfill the requirements." FAR 25.403(c)(1) (emphasis added). Thus, if a government procurement is covered by the WTO GPA, an agency may award the contract to an otherwise non-TAA-compliant offeror only if one of those two exceptions applies.

procurement, and least developed countries. 19 U.S.C. § 2511(b); FAR 25.400(a). There are currently over 120 designated countries under the TAA. *See* FAR 25.003. For purposes of this Memorandum and Order, the Court references offers of products from designated countries as "TAA-compliant" offers and offers of products from non-designated countries as "non-TAA-compliant" offers.

[5] In addition, the TAA permits agency heads, subject to interagency review, to waive the prohibition on a case-by-case basis when doing so is in the national interest. 19 U.S.C. § 2512(b)(2). No waiver has occurred related to the present action. *See, e.g.*, AR 892 (citing exception to TAA, rather than waiver, as authority).

## II.    The VA's Need for Prasugrel

Prasugrel is a medication used as a blood thinner to lower the risk of heart attacks and strokes.  The drug comes in both a branded form under the name Effient, and a generic form.  Administrative Record (AR) 299, 302.  Currently, the brand name drug is available to the VA under a Federal Supply Schedule (FSS) contract with Cosette, and generic versions are available on an open market basis.  AR 20.  However, the VA contends that supply through those mechanisms is not guaranteed, and prices may vary over time.  *Id.*  Accordingly, the VA seeks to procure prasugrel via a national standardization contract to ensure the consistent availability of the medicine for nationwide usage and to obtain volume-based, committed-use pricing.  AR 20, 41.  Such a contract would establish the price for prasugrel products, which the VA anticipates will be ordered and distributed to the VA, the Department of Defense, the Indian Health Service, the Bureau of Prisons, and other federal agencies.  AR 41.

## III.    The VA's Solicitation

The VA issued the Solicitation for the procurement of prasugrel in 10-mg and 5-mg forms on September 17, 2024, with offers due on October 8, 2024.  AR 35, 117.  The Solicitation called for a firm fixed price, indefinite-delivery requirements contract requiring prasugrel tablets to be delivered across one base year and four option years.  AR 43, 97.  The Solicitation estimated annual quantities of 80,262 bottles of 10-mg tablets and 4,724 bottles of 5-mg tablets.  AR 36–37.  The VA would evaluate proposals under FAR Parts 12, 15, and 25, with the award going to the offeror that submitted the lowest evaluated price meeting the Solicitation's requirements.[6]  AR 40, 98, 99.

---

[6] Specifically, the Solicitation established five criteria offers must meet to be considered technically acceptable: (i) the offered items must fully meet the product description, (ii) the National Drug Code number of each product must be unique to the offeror, (iii) the offered drugs must be FDA-approved, (iv) the places of performance must be FDA cGMP acceptable for the

Under the Solicitation, offers of U.S.-made or designated-country end products would be evaluated "without regard to the restrictions of the Buy American statute." AR 97. Next, the Solicitation incorporated the TAA's restrictions, stating that the "Government will consider for award only offers of U.S.-made or designated country end products unless the Contracting Officer (CO) determines that there are no offers for such products or that the offers for those products are insufficient to fulfill the requirements of this solicitation." AR 97. To implement these provisions, the Solicitation required offerors to submit a Trade Agreements Certificate, certifying that each end product was U.S.-made, manufactured in a TAA-designated country, or otherwise identifying each end product and its country of origin. AR 108, 153.

## IV.    The Award Process

### A. The Offers

The VA received six proposals in response to the Solicitation, and the contracting officer (CO) determined it necessary to enter into discussions with all six offerors.[7] AR 895, 901, 1028. During its discussion with Cosette on October 29, 2024, the VA "reminded Cosette that the Government can only award contracts with prices that have been determined to be fair and reasonable" per FAR 15.404-1(b) and suggested that Cosette's current pricing may not be considered fair and reasonable. AR 746, 895, 910. The Government concluded all discussions on October 29, 2024, and requested that the offerors submit their best and final pricing in their final proposal revisions by November 4, 2024. AR 895. Cosette submitted a final proposal revision

---

product type offered, and (v) the manufacturing facility must have clearance by the FDA to manufacture under the specific NDA/ANDA/BLA cited/used in the offer. AR 99.

[7] The six companies include: Golden State, ███████████████████ Cosette, ███
███████████████████. *See generally* AR 118-738

7

but did not alter its proposed pricing.  *Id.*  Five offerors remained after submission of the final proposal revisions.[8]

Of the five remaining offerors, Cosette alone offered to supply a TAA-compliant product. AR 890.  Cosette's prasugrel is manufactured in Germany and has an active pharmaceutical ingredient from Japan, both designated countries under the TAA.  AR 301; FAR 25.003.  Notably for the present protest, the other four offerors offered to supply prasugrel from India, which is not a TAA-compliant country.  *See* FAR 25.003.

Also important to the present protest, Cosette's prices were dramatically higher than the other offers, as demonstrated in the following table:

| Offeror | Unit Price for 10MG | Unit Price for 5MG | Annual Price | Total Price (base year plus four option years) |
|---|---|---|---|---|
| **Golden State** | | | | |
| ███████████ | | | | |
| | | | | |
| **Cosette** | | | | |
| Independent Government Cost Estimate (IGCE) | $7.49 | $6.49 | $631,821.14 | $3,159,105.70 |
| Procurement on the Open Market[9] | $21.26 | $21.50 | $1,807,936.12 | $9,039,680.60 |

AR 875, 877, 880, 894.

---

[8] The VA rejected Shams Al-Warith's submission as untimely.  AR 911.

[9] As noted, the Government may procure prasugrel via several methods.  First, it can order the drug via an FSS contract, which in this case would mean the VA would order the drug from Cosette at a price similar to Cosette's offer.  AR 5 (stating FSS prices of $336.33 and $336.51 for 10mg and 5mg packages from Cosette, respectively).  Second, it can award a national contract to procure the drug, as it seeks to do via the present Solicitation.  Third, it can procure prasugrel via the open market through the McKesson Connect database, which is the VA's vendor for open market purchases.  AR 20.  The VA used the prices listed in the McKesson Connect to arrive at an open market pricing figure.  AR 913.

Not only was Cosette's price markedly higher than the other offers, but it was also orders of magnitude higher than both the IGCE price and the price of procurement on the open market. Cosette contends there is such a significant price discrepancy because Cosette offered a branded version of prasugrel while the others offered a generic version.[10]  AR 893, 889.

### B.  The Competitive Range Determination

On November 12, 2024, the contracting officer (CO) made a competitive range determination after evaluating the final revised proposals for the five remaining offerors.  AR 911. The Determination states that a competitive range was necessary "[d]ue to the urgent need to award a contract" for prasugrel.  AR 1030.  The CO determined that the four offers besides Cosette represented the "lowest priced proposals . . . in a similar range," and excluded Cosette from the competitive range.  AR 1029–30.  Specifically, the CO found that the difference between the lowest price and the fourth lowest price offer was ██████, while the difference between the fourth lowest price and the fifth lowest price offer (Cosette) was ██████.  AR 1029. According to the VA, such an extraordinary pricing gap was "too significant to warrant keeping" Cosette's offer in the competitive range.  *Id.*  With Cosette excluded, only four proposals remained, none of which offered TAA-compliant products.  On November 26, 2024, Cosette received a letter notifying it of its exclusion.  AR 868–90.

### C.  The Non-Availability Determination

On December 20, 2024, prior to awarding the contract, the VA issued a "Determination of Non-Availability."  AR 887.  The Determination acknowledges that if a TAA-compliant,

---

[10] The Government determined that the therapeutic factor between a branded version of prasugrel and the different versions of the generics is the same.  AR 13.  Accordingly, apart from price, it is of no relevance to the present dispute that Cosette offered the branded version of prasugrel.  *Id.*

technically acceptable offer is received, the agency must award to that offeror. AR 890. However, the Determination stated that the VA did not include Cosette's offer—the only TAA-compliant offer—in the competitive range because its pricing was significantly higher than the other offers. *Id*. Therefore, according to the VA, the agency did not receive a "competitively priced" TAA-compliant offer in response to the Solicitation, thus permitting the VA to make the award to a non-TAA-compliant offeror. AR 891. Despite referencing the concept of a fair and reasonable price, the Non-Availability Determination did not expressly state that Cosette's prices were unfair or unreasonable. *See* AR 887–891.

### D. The Source Selection Determination

The VA evaluated the remaining four proposals. AR 912. First, it assessed the proposals' technical acceptability, rejecting one offeror, Success Storage, for not meeting the Solicitation requirements. *Id*. Three offerors remained. Of those three offerors, Golden State offered the lowest price at $2,445,241.70. *See* AR 913. As the lowest priced technically acceptable offer, Golden State was the presumptive awardee. Before making the award, the VA analyzed whether Golden State's offer was a fair and reasonable price. *See* AR 914. The VA compared Golden State's price to (i) the other offers, (ii) the prices for procuring prasugrel on FSS and open market, and (iii) the IGCE, which tracked the prices historically paid for the drug. AR 914. As Golden State's prices were significantly lower than its comparators, the VA found that Golden State's prices were fair and reasonable. *Id*. Accordingly, on January 27, 2025, the VA made its award to Golden State.[11] AR 919.

---

[11] Cosette wrote the VA on January 24, 2025, after the Source Selection Determination, raising concerns that the VA had disregarded evidence that the other offerors were providing non-TAA-compliant products. AR 1014, 1017–18. The VA responded to Cosette that the VA had addressed and considered all of Cosette's concerns during source selection. AR 1024.

## V.    Procedural History

Two weeks later, on February 14, 2025, Cosette filed its Complaint challenging the VA's award to Golden State.[12]  ECF No.1 (Complaint or Compl.).  On March 10, 2025, pursuant to this Court's Scheduling Order, the VA made the AR available for review.[13]  ECF No. 19 (Scheduling Order, dated Nov. 22, 2024); ECF No. 20 (Notice).  The VA subsequently amended the AR on May 1, 2025 to add two additional documents.  *See* ECF No. 32.  On March 28, 2025, Plaintiff filed its Motion for Judgment on the Administrative Record (MJAR)[14] and Defendant filed its MJAR and Response to Plaintiff's MJAR on April 22, 2025.[15]  On May 13, 2025, Plaintiff filed its Response and Reply[16] and Defendant filed its Reply on May 27, 2025.[17]  On June 25, 2025, the Court conducted oral argument.  *See* Transcript, dated June 25, 2025 (ECF No. 41) (OA Tr.).  Accordingly, the parties' Cross-MJARs are fully briefed and ripe for review.[18]

---

[12] Golden State did not move to intervene in this action.

[13] The Government agreed to voluntarily stay performance until November 2, 2025.  ECF No. 39.

[14] Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 27) (Pl. MJAR).

[15] Defendant's Cross-Motion for Judgment on the Administrative Record and Response in Opposition to Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 29) (Def. MJAR).

[16] Plaintiff's Response in Opposition to Defendant's Cross-motion For Judgment on the Administrative Record and Reply in Support of Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 33) (Pl. Resp.).

[17] Reply to Plaintiff's Response in Opposition to Defendant's Cross-Motion for Judgment on the Administrative Record (ECF No. 34) (Def. Reply).

[18] On August 22, 2025, Cosette filed an unopposed motion for the Court to take judicial notice of a recent Court of Federal Claims decision, *Davinci Co., LLC v. United States*, No. 24-1238, 2025 WL 2254550, at *1 (Fed. Cl. July 31, 2025).  ECF No. 42.  The Court grants this motion.

## APPLICABLE LEGAL STANDARDS

The Tucker Act, 28 U.S.C. § 1491(b)(1), as amended by the Administrative Dispute Resolution Act of 1996, provides this Court with jurisdiction over bid protests.  *See Eco Tour Adventures, Inc. v. United States*, 114 Fed. Cl. 6, 41 (2013) ("In [enacting the ADRA], Congress . . . provided this court with a new, and independent, basis for bid protest jurisdiction[.]").  This Court reviews post-award bid protests in two steps.  *First*, the Court analyzes the procurement under the Administrative Procedure Act (APA) standard to determine whether the Agency "acted without rational basis or contrary to law when evaluating the bids and awarding the contract." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005); 28 U.S.C. § 1491(b)(4); *see Oak Grove Techs., LLC v. United States*, 116 F.4th 1364, 1374 (Fed. Cir. 2024).  *Second*, the Court considers whether the alleged errors prejudiced the protestor.  *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1308 (Fed. Cir. 2021) (citing *Bannum*, 404 F.3d at 1351).

At the first step, the APA requires a reviewing court to determine whether an agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 284 (1974).  Thus, to prevail in a post-award bid protest, a plaintiff must demonstrate that "(1) 'the procurement official's decision lacked a rational basis' or (2) 'the procurement procedure involved a violation of regulation or procedure.'"  *DynCorp*, 10 F.4th at 1308 (quoting *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020)).  When a disappointed bidder alleges a violation of regulation or procedure, the Court reviews whether there was "a clear and prejudicial violation of applicable statutes or regulations."  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001) (quoting *Kentron Hawaii, Ltd v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).  When a bidder alleges that the procurement official's decision lacked a rational basis, the Court reviews "whether the contracting agency provided a coherent and

reasonable explanation of its exercise of discretion." *Dell Fed. Sys., L.P. v. United States,* 906 F.3d 982, 992 (Fed. Cir. 2018) (quoting *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004))*.*

At step two, this Court evaluates the factual question of prejudice. *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 998 (Fed. Cir. 2021) (citing *WellPoint Mil.*, 953 F.3d at 1377). A protestor establishes prejudice by showing "that there was a 'substantial chance' it would have received the contract award but for that error." *Sys. Stud. & Simulation*, 22 F.4th at 998 (quoting *Bannum*, 404 F.3d at 1353). In other words, the disappointed bidder must have been "within the zone of active consideration." *Colonial Press Int'l, Inc. v. United States*, 788 F.3d 1350, 1355 (Fed. Cir. 2015) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996)); *see C.A.C.I., Inc.-Fed. v. United States*, 719 F.2d 1567, 1574–75 (Fed. Cir. 1983).

In the Court of Federal Claims, bid protests are adjudicated under Rule 52.1(c), which provides an expedited trial on a "paper record, allowing fact-finding by the trial court." Rule 52.1(c) of the Rules of the United States Court of Federal Claims (Rule(s)); *Bannum*, 404 F.3d at 1356 (referencing Rule 56.1, which was replaced by Rule 52.1(c)). Unlike at summary judgment, genuine disputes of material fact do not preclude the Court from granting a motion for judgment on the administrative record. *Bannum*, 404 F.3d at 1357. This Court is empowered to provide any relief, including declaratory or injunctive relief, that it deems proper. 28 U.S.C. § 1491(b)(2); *Oak Grove*, 116 F.4th at 1375.

## DISCUSSION

Both parties agree that the TAA, its implementing regulations, and the Solicitation generally bar the VA from awarding a contract to a non-TAA-compliant source. Pl. MJAR at 15–16; Def. MJAR at 19–20. Despite receiving a TAA-compliant offer from Cosette, however, the VA awarded the contract to Golden State, which did not submit a TAA-compliant offer.

Cosette contends such an award was unlawful, because applicable law required the VA to award to a TAA-compliant source, leaving only Cosette eligible.  Compl. ¶¶ 54–58; Pl. MJAR at 17. Cosette notes that apart from the Solicitation, the Government can also lawfully obtain the drug via the FSS contract or on the open market.  Pl. MJAR at 36.  Defendant contends that the award was permissible because the VA deemed Cosette's price not fair and reasonable, as it was substantially higher than the non-TAA-compliant offers.  Def. MJAR at 19–21.  Cosette counters that such a price comparison was legally improper and, in any event, that its price was fair and reasonable as a matter of law.  Pl. Resp. at 18–22.

As detailed below, the Court begins its analysis with the text and structure of the TAA and concludes that the TAA does not permit Cosette's exclusion for price unreasonableness based on comparisons to non-TAA-compliant offerors, even within a competitive range determination. Next, the Court examines FAR 25.502 and concludes that it does not disturb the Court's interpretation of the statute.  The Court further finds that the establishment of a competitive range was arbitrary and capricious.  Finally, the Court rejects Cosette's argument that, as the remaining TAA-compliant offer, the VA must deem Cosette's exorbitant offer price fair and reasonable as a matter of law.

## I.    The VA's Determination Was Contrary to the TAA

The Supreme Court has made clear that courts must "exercise their independent judgment in deciding whether an agency has acted within its statutory authority" and "may not defer to an agency interpretation of the law simply because a statute is ambiguous."  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024).  To be sure, in some cases "the statute's meaning may well be that the agency is authorized to exercise a degree of discretion," when, for instance, the statute leaves the agency "with flexibility."  *Id.* at 394–95 (quoting *Michigan v. EPA*, 576 U.S.

743, 752 (2015)).  However, even in those cases, "the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits."  *Id.*  "The court fulfills that role by recognizing constitutional delegations, 'fixing the boundaries of the delegated authority,' . . .  and ensuring the agency has engaged in 'reasoned decisionmaking' within those boundaries."  *Id.* (citation modified).  Thus, while the phrase "insufficient to fulfill the requirements of the United States Government" leaves the VA flexibility to define its operational needs, whether the TAA prohibits the VA from defining "insufficient" via a comparison to non-TAA-compliant offers is a legal question for the Court to resolve.

### A.  The VA's Price Reasonableness Determination Does Not Fall Under the TAA's Exception for Insufficiency

The parties agree that the TAA governs this procurement and generally prohibits the Government from awarding contracts to non-TAA-compliant sources.  *See* Def. MJAR at 20; Pl. MJAR at 7.  Despite receiving a TAA-compliant offer from Cosette, however, the VA awarded the contract to Golden State, which provided a non-TAA-compliant offer.  Defendant contends that this award was nonetheless permissible under the TAA's second exception,[19] which permits an award to a non-compliant offeror when a TAA-compliant offer is "insufficient to fulfill the

---

[19] In its briefing, Defendant states that the TAA is not a categorical bar to awarding a contract to a non-TAA-compliant offeror because the TAA contains two exceptions.  Def. MJAR at 20; Def. Reply at 11.  Defendant did not point to which exception it believed the procurement fell into. When asked at oral argument, Defendant conceded that the first exception was inapplicable because Cosette's offer was received by the VA and FAR 25.403(c)—the applicable implementing rule—describes the first exception as applying when no TAA-compliant offers are "received," and thus the second exception was the relevant one.  *See* OA Tr. 43:15–44:7.  The AR further confirms that Cosette's TAA-compliant offer was received.  *See e.g.*, AR at 889 ("Six offers were received; one of which (from [Cosette]) contained U.S.-made products."); AR 896 (listing Cosette's final proposal revision as having been "received").

requirements of the United States Government." 19 U.S.C. § 2512(a)(2). According to Defendant, Cosette's offer was insufficient because its price was not "fair and reasonable," and it is a requirement of the Government to only award a contract to an offeror whose price is fair and reasonable.[20] *See* Def. MJAR at 21, 25 (citing FAR 15.402). However, the VA's determination[21] that Cosette's price was not fair and reasonable rested on a comparison between Cosette's TAA-compliant offer and non-TAA-compliant sources.[22] *See* AR 890, 1029. Cosette argues that, under the TAA, an offeror's price cannot be deemed unreasonable—and therefore insufficient—based on such a comparison to non-TAA-compliant offers, characterizing it as an "apples-to-oranges" analysis. *See* Pl. MJAR at 18–19; OA Tr. 10:14–18. Defendant does not directly engage with this point and instead side-steps the issue by insisting that the CO properly applied the FAR in finding Cosette's price unreasonable. *See* Def. MJAR at 25–26.

The Court agrees with Cosette. As explained further below, the TAA does not permit an agency to declare a TAA-compliant offer "insufficient to fulfill the requirements of the United States" simply because its price compares unfavorably to non-TAA-compliant alternatives.[23]

---

[20] Cosette does not dispute that the VA may evaluate its price for reasonableness; it argues instead that the VA erred by performing that analysis before excluding non-TAA-compliant offers. *See* Pl. MJAR at 18–19.

[21] It is unclear from the record if such a determination was in fact made. *See infra*, n.27.

[22] In the Administrative Record, the CO compares Cosette's price to the prices of the other, non-TAA compliant offerors. AR 1029. He also compares Cosette's price to the ICGE. *Id.* The VA based its IGCE, however, on Golden State's incumbent contract price and as such both comparisons rely on the price of non-TAA-compliant products. AR 888.

[23] To be clear, the Court does not hold that agencies are barred from conducting price reasonableness analyses of TAA-compliant offers. It holds only that if a TAA-compliant offer's price is deemed unreasonable by comparison to non-TAA prices, that determination alone cannot render the offer "insufficient" under the TAA.

Absent some other independent basis for insufficiency, the statute's prohibition on awarding to a non-TAA-compliant offer remained in force, and the VA's award here contravened that bar.

In determining this question, the Court must begin with the text of the statute. *See Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009); *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004); *Strategic Hous. Fin. Corp. of Travis Cty. v. United States*, 608 F.3d 1317, 1323 (Fed. Cir. 2010). "If the statutory language is plain, [the Court] must enforce it according to its terms." *King v. Burwell*, 576 U.S. 473, 474 (2015). When considering whether the language is plain, "[the Court] must read the words in their context and with a view to their place in the overall statutory scheme." *Id.* (quotations omitted); *see also West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 721 (2022).

Text and structure point to a clear answer. "The meaning of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."). *Syngenta Crop Prot., LLC v. Willowood, LLC*, 944 F.3d 1344, 1359 (Fed. Cir. 2019) (internal quotations omitted). That context "always includes evident purpose," which "always includes effectiveness." *Transpacific Steel LLC v. United States*, 4 F.4th 1306, 1323 (Fed. Cir. 2021) (quoting A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* § 4, at 63 (2012)). The TAA's express aim is to "encourage additional countries to become parties to" the WTO GPA; Congress pursued that aim by imposing a categorical bar on the procurement of non-TAA-compliant products. 19 U.S.C. § 2512(a)(1). That prohibition has bite precisely when non-compliant offers appear cheaper or more attractive than compliant ones, because those are the circumstances in which the temptation to procure non-compliant offers would otherwise arise. Necessarily, such a prohibition will sometimes require the Government to accept a worse financial deal than would be available if the TAA did not exist. However, Congress accepted that tradeoff in service of broader market-access objectives, and it is

17

not for the Court to revisit that policy choice. *See Rodriguez v. United States*, 480 U.S. 522, 526 (1987) (per curiam) ("Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice.").

Congress paired the bar with two exceptions, one of which arises when TAA-compliant offers "are insufficient to fulfill the requirements of the United States Government." 19 U.S.C. § 2512(a)(2)(B). By its terms, Section 2512(a)(2)(B) does not apply if a TAA-compliant offer fulfills the requirements. The plain language does not invite a comparison against non-TAA-compliant proposals, which would allow a buyer to avoid Section 2512(a)(1)'s prohibition whenever non-compliant products cost less. If Congress had meant to permit that kind of analysis, it knew how to say so: in fact, Congress created just that structure in the BAA's express cost exception, allowing agencies to bypass the BAA's preference when domestic products are too expensive. *See* 41 U.S.C. § 8302(a)(1); *supra* n.3. By contrast, the TAA, which directly relates to the BAA, contains no such carveout. *See* FAR 25.402(a)(1) (indicating that "[t]he Trade Agreements Act . . . provides the authority for the President to waive the Buy American statute). Instead, in designing the TAA, Congress paired its categorical prohibition with a narrower, requirement-focused exception. *See Caddell v. Dep't of Just.*, 96 F.3d 1367, 1371 (Fed. Cir. 1996) ("Congress easily could have" drafted the statute to include certain language, and the court would not read into the statute what Congress chose to omit); *see also* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* § 8 at 93 (2012) (courts should not "elaborate unprovided-for exceptions to a text . . . 'If the Congress had intended to provide additional exceptions, it would have done so in clear language'") (citing *Petteys v. Butler*, 367 F.2d 528, 538 (8th Cir. 1966) (Blackmun, J., dissenting)). Thus, a TAA-compliant offer is not rendered insufficient under the statute merely because it carries a higher price than non-TAA-compliant offers.

18

Defendant nonetheless argues that it properly determined that Cosette's price was insufficient by recasting its actions as a price reasonableness determination.  Def. MJAR at 20–21. Defendant asserts that, as FAR 15.402(a) directs agencies not to pay more than a fair and reasonable price, the VA's comparison of Cosette's price to non-TAA prices simply applied the TAA's "insufficient" exception, rather than creating a new one.  Def. MJAR at 25; OA Tr. 43:24–44:6.  The problem is not that the agency followed the direction to determine price reasonableness, but that the determination compared TAA-compliant against non-TAA-compliant offers.  By Defendant's standard, any time a TAA-compliant offer is less attractive than a non-TAA-compliant one, the agency could simply relabel that disadvantage as a "failure to fulfill the requirements," and thereby circumvent the statutory prohibition.  This recasting of the statute would allow the "sufficiency" of a TAA-compliant offer to hinge on the relative attractiveness of non-TAA-compliant offers and reintroduce competition from which Congress had deliberately shielded TAA-compliant offers.

At bottom, using FAR 15.402 to expand the term "insufficiency" in the TAA would result in the exception consuming the rule.  The prohibition against procuring non-TAA-compliant products matters most when non-TAA-compliant offers look better in terms of price or features than TAA-compliant ones; those are the very moments when the bar is meant to apply.  To allow agencies to reintroduce those disfavored offers as the benchmark of sufficiency would mean the statute's prohibition collapses precisely when it is intended to be strongest, contrary to the "plain logic" of the statute.[24]  *See Env't Prot. Agency v. EME Homer City Generation, L.P.*, 572 U.S.

---

[24] While not precedential, the Court notes that multiple GAO decisions reinforce the same rule against distorted benchmarks.  For example, the GAO has repeatedly held that when conducting price-reasonableness analyses, agencies may not rely on prices skewed by unacceptable or ineligible offers.  *See Lifecycle Constr. Servs., LLC*, B-406907, 2012 WL 5194140, at *6 (Comp. Gen. Sept. 27, 2012); *Kilda Grp., LLC*, B-409144, 2014 WL 1338281, at *4 (Comp. Gen. Jan. 29,

489, 525 (2014) (Scalia, J., dissenting). That is the definition of an exception swallowing the rule, a result Congress "is unlikely to intend." *Env't Prot. Agency v. Calumet Shreveport Ref.*, 145 S. Ct. 1735, 1751 (2025); *Smith & Wesson Brands v. Estados Unidos Mexicanos,* 605 U.S. 280, 299 (2025) (holding that giving an exception "such a capacious" reading, would swallow most of the rule, which is not what Congress intended). Instead, the Court takes a similar view to the court in *Davinci Co., LLC v. United States*: the FAR cannot "enlarge th[e TAA's] statutory command," 178 Fed. Cl. 63, 70–71 (2025).

Recognizing the breadth of its proposed exception, Defendant suggested at oral argument that the statute may permit an "insufficiency" finding only when a TAA-compliant offer is "exorbitantly" higher than non-TAA-compliant prices. *See* OA Tr. 42:10–24. That proposed standard does not exist in the statute. Indeed, the plain text of Section 2512(a)(2)(B) contains no such qualifier, and the Court cannot red pen exceptions into the statute that Congress declined to enact. *See Freytag v. Comm'r*, 501 U.S. 868, 874 (1991) (quoting *Hallstrom v. Tillamook County*, 493 U.S. 20, 27 (1989)). As noted above, Congress could have written a comparative-price provision into the TAA, but it did not, and accordingly the term "insufficient to fulfill the requirements" cannot be repurposed, even where Defendant acts to preserve the public fisc. *See Maracich v. Spears*, 570 U.S. 48, 60 (2013) ("Unless commanded by the text, however, [] exceptions ought not operate to the farthest reach of their linguistic possibilities."). Congress did not intend to permit price disparities—whether large or small—to justify procurement of non-

---

2014); *Root9B, LLC*, B-417801, 2019 WL 7759700, at *7 n.6 (Comp. Gen. Nov. 4, 2019). Most relevant here, the GAO rejected the use of such "invalid benchmarks" in a TAA procurement where the Government declined the only technically acceptable, TAA-compliant offer as unreasonable based on (1) a price estimate derived from open-market prices that included non-TAA-compliant products and (2) a comparison to a technically unacceptable offer. *AvKARE, Inc.*, B-417250, 2019 WL 3202586, at *3 (Comp. Gen. Apr. 18, 2019).

compliant products.[25]  *See Turtle Island Restoration Network v. Evans*, 284 F.3d 1282, 1296 (Fed. Cir. 2002) ("When Congress omits from a statute a provision found in similar statutes, the omission is typically thought deliberate.").

This understanding underscores why Defendant's construction cannot be sustained.  As discussed, the TAA's prohibition matters precisely when a non-TAA-compliant offer appears cheaper or more attractive than a compliant one, and Congress accepted that tradeoff as part of the statute's design.  Permitting agencies to treat that comparative judgment as a basis for "insufficiency"—whether through a straightforward comparison or an "exorbitant" gap—would amount to judicial engraftment of the statute and reintroduce non-TAA-compliant offers into the very analysis from which Congress deliberately excluded them.  That outcome is inconsistent with the statutory scheme and, as noted, with the settled principle that exceptions must not be read to swallow the rule.

Such a construction does not leave the Government helpless in the face of extraordinarily expensive TAA-compliant offers.  First, the TAA itself authorizes agency heads to waive, subject to interagency review, the TAA's prohibition "on a case-by-case basis when in the national interest."  19 U.S.C. § 2512(b)(2).  The VA has not done so here.  Thus, faced with the prospect

---

[25] Defendant contends that the BAA's unreasonable-price exception should not inform the interpretation of the TAA.  Def. Reply at 7.  Its only justification for this position is that the two statutes pursue different policy goals: the BAA balances support for domestic industry with cost control, while the TAA, in Defendant's view, seeks only the latter—reducing costs regardless of whether goods are domestic or from designated partners.  *Id.*  Accordingly, Defendant claims that it was unnecessary to include an explicit price exception in the TAA.  *Id.*  That position, however, is contradicted by the statute itself.  The TAA makes clear that its central purpose is "to encourage additional countries to become parties to the Agreement and to provide appropriate reciprocal competitive government procurement opportunities to United States products."  19 U.S.C. § 2512.  Like the BAA, which deliberately privileged domestic suppliers over lower prices, the TAA prioritizes reciprocity even at higher cost.  *See id.*  Because Defendant identifies no other distinction between the statutes, and its sole rationale rests on a mischaracterization of the TAA's aim, Defendant's effort to discount the express unreasonable-price exception in the BAA fails.

of being forced to procure a much more expensive TAA-compliant product, the VA could attempt to waive the TAA's prohibition if that is "in the national interest." *Id.* Second, as Cosette acknowledges, the VA could evaluate the reasonableness of Cosette's offer "in a competitive range of one," without comparing it to the non-TAA-compliant offers. OA Tr. 13:8–12. Such an evaluation may include factors listed in FAR 15.404(1)(b)(2), so long as non-TAA-compliant offers are not relied upon for comparison. Pl. MJAR at 18–19. Only then could the Government decide whether to accept Cosette's offer. OA Tr. 13:15–16. Finally, as Cosette acknowledges, the Government can opt to cancel the Solicitation, and "can always go on to the open market" to procure prasugrel.[26] OA Tr. 13:15–16; 14:5–6; *see* Def. Reply at 19–20 (acknowledging agency could cancel solicitation and purchase drug elsewhere).

### B. The VA's Use of a Competitive Range Determination to Exclude Cosette Runs Contrary to the TAA

Throughout its briefing, Defendant continually seeks to justify its decision to exclude Cosette by asserting that Cosette's price was rejected from the competitive range as not fair and reasonable. Def. MJAR at 21, 22–23; Def. Reply at 15–18.[27] It argues that the competitive range

---

[26] Additionally, it is undisputed that the VA may also procure prasugrel on the FSS. OA Tr. 16:1–3 (Plaintiff: "there is already availability on the FSS"); Def. MJAR at 9 ("prasugrel tablets are available in the branded form under a [FSS] contract").

[27] It is not clear from the record that the Defendant ever made such a determination outright. In its Non-Availability Determination, the VA determined that "for the purpose of this procurement, no *competitively priced* offers of [TAA-compliant] end-products were received in response to the subject Solicitation for Prasugrel Tablets in sufficient quantity, of satisfactory quality or in the required form, to meet Agency requirements." AR 891 (emphasis added). Labelling Cosette's offer as not "competitively priced" is not a clear determination that the offer was not "fair and reasonable." *Id.* Further, while the record alludes to the idea that Cosette's price was unreasonable, it never states so explicitly. *See* AR 890 (discussing price reasonableness factors but not officially making a price reasonableness determination); AR 1028 (describing discussions with Cosette where Defendant warned it that its price "may not be" fair and reasonable). Finally, Defendant stated throughout its briefing that a price reasonableness determination was made, *see e.g.*, Def. MJAR at 28, but at oral argument, counsel for Defendant disavowed that position and

is a price evaluation tactic within the CO's discretion, and that nothing bars Cosette's elimination from the competitive range prior to an evaluation of TAA compliance. Def. Reply at 15. The Court holds that the use of a competitive range does not allow the VA to ignore the TAA's threshold bar here.

A competitive range determination serves to narrow the field of offers and to facilitate meaningful discussions aimed at refining proposals and improving value. *See Birch & Davis Int'l*, 4 F.3d at 973–74; *Scott Techs., Inc. v. United States*, 168 Fed. Cl. 705, 719 (2023). This process supports efficiency by focusing agency resources on viable proposals. *See Quantico Tactical Inc. v. United States*, 150 Fed. Cl. 566, 573 (2020), *aff'd*, 835 F. App'x 598 (Fed. Cir. 2021). "A contracting officer has broad discretion in determining [the] competitive range, and such decisions are not disturbed unless clearly unreasonable." *Birch & Davis Int'l, Inc. v. Christopher*, 4 F.3d 970, 973 (Fed. Cir. 1993). However, that discretion does not allow the CO to suspend the TAA's applicability to a procurement: excluding an offer from the competitive range is not the same as finding it "insufficient to fulfill the requirements of the United States Government" so as to permit awarding of a contract to a non-TAA-compliant offeror. 19 U.S.C. § 2512(a)(2)(B). The record reveals that the CO did not exclude Cosette from the competitive range because its offer was insufficient to fulfill the Solicitation's requirements, but rather because of the "significant gap in pricing" between Cosette and non-TAA-compliant offers. *See* AR 890, 895; *see also* Def. Reply at 17 ("In the [CO]'s judgment, the price difference between Cosette's price and the other prices was too significant to warrant including Cosette's offer in the competitive range.").

To treat exclusion from a competitive range as automatically meeting the "insufficiency" exception would impermissibly expand the scope of the exception, permitting agencies to use a

---

agreed that the VA did not conduct a price reasonableness determination for Cosette's offer. OA Tr. 41:1–13.

competitive range determination to evade the prohibitions of the TAA whenever a TAA-compliant offer was less attractive relative to its non-TAA-compliant rivals. Again, such judicial engraftment to the plain text is impermissible. *King v. Burwell*, 576 U.S. 473, 486 (2015) ("If the statutory language is plain, [the Court] must enforce it according to its terms."). Furthermore, unlike its price reasonableness argument, reflected above, Defendant does not directly argue that a failure to be included in the competitive range is equivalent to a failure to meet a requirement of the Solicitation. *Contrast* Def. MJAR 22–26, *with supra* I.A *and* OA Tr. 43:24–44:6. Accordingly, this premature Competitive Range Determination cannot be the basis for awarding the contract to a non-TAA-compliant offeror.

## II.    FAR 25.502 Does Not Resolve This Dispute

Both parties devote briefing to provisions of FAR 25.502, each contending that the regulation mandates a result in their favor. *See* Pl. Resp. at 7–9; Def. Reply at 12–14. This section of the FAR guides contracting officers through the process of evaluating domestic and foreign offers under several regulatory schemes that could apply, such as the TAA and the BAA rules. *See* FAR 25.502. Cosette maintains that FAR 25.502 required the VA to eliminate non-TAA-compliant offers entirely before any assessment of Cosette's price reasonableness, and then to make an award to Cosette. Pl. Resp. at 7. The Government responds that the contracting officer followed the FAR's procedures by evaluating Cosette's price in comparison to non-TAA-compliant offers. Def. Reply at 14–15. Neither argument is persuasive. FAR 25.502 does not mandate upfront elimination of non-TAA-compliant offers or an automatic award to Cosette, nor does it allow the VA to evade the requirements of the TAA.

FAR 25.502 establishes the evaluation framework for foreign acquisitions. Subsection (a) prescribes a sequence: first, eliminate offers that are "unacceptable for reasons other than price,"

such as nonresponsive proposals, suspended or debarred offerors, or prohibited sources, FAR 25.502(a)(1); next, rank the remaining offers by price, FAR 25.502(a)(2); and finally, if award is based on factors beyond price, apply those factors and use the "evaluated price" in the best-value determination, FAR 25.502(a)(3). For procurements covered by the WTO GPA, FAR 25.502(b) adds further steps: contracting officers must "consider only" compliant offers unless none are received, FAR 25.502(b)(1), and, if the agency gives the same consideration given eligible offers to offers of U.S.-made end products that are not domestic end products, award on the low offer; otherwise, evaluate according to agency procedures. FAR 25.502(b)(2). If no compliant offers exist, the agency must issue a nonavailability determination before awarding to a noncompliant source, FAR 25.502(b)(3).

Cosette's first argument rests on FAR 25.502(a)(1). It contends that non-TAA-compliant offers must be deemed "nonresponsive" and eliminated immediately. Pl. Resp. at 7. As Defendant correctly notes, however, "nonresponsive" is a term of art referencing proposals that fail to meet material solicitation requirements. Def. Reply at 12; *see Excel Mfg., Ltd. v. United States*, 111 Fed. Cl. 800, 806 n.3 (2013); *see also Asset Prot. & Sec. Servs., L.P. v. United States*, 5 F.4th 1361, 1365 (Fed. Cir. 2021) (holding a proposal nonresponsive because it "included information that expressly contradicted the solicitation's material terms"). The offer of a TAA-complaint product was not a mandatory or material requirement here because the TAA, the FAR, and the Solicitation itself all contemplate the possibility of award to non-TAA-compliant sources under specified statutory exceptions and conditions. *See* 19 U.S.C. § 2512(a)(2); FAR 25.403(c); AR 108. Further, reading "nonresponsive" to encompass non-compliance with the TAA would also render Subsection (b) of FAR 25.502 superfluous, which runs contrary to the rule against surplusage. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 669 (2007) (cautioning against

reading regulations in a manner that makes certain provisions superfluous). Indeed, Section (b)(3) presumes that non-TAA-compliant offers remain available. *See* FAR 25.502(b)(3). Yet, if non-TAA-compliant offers were categorically "nonresponsive" at the outset under FAR 25.502(a)(1), then no non-compliant offers would reach the steps in FAR 25.502(b). Therefore, FAR 25.502(a)(1) does not dictate that the agency must immediately eliminate non-TAA-compliant offers as "unresponsive."

Cosette next asserts that FAR 25.502(b) (1) bars consideration of non-TAA-compliant offers when a TAA-compliant one has been received, and (2) mandates that the VA must award the contract to Cosette as the lowest-price offer still within consideration. Pl. MJAR at 16–19; Pl. Resp. at 7, 11–13. The FAR directs the agency to "[c]onsider only" TAA-compliant offers at (b)(1); then "award on the low offer" according to the circumstances outlined in (b)(2) and (b)(3). *See* FAR 25.502(b)(1)–(b)(3). Subsection (b) does not eliminate the government's ability to conduct an evaluation of a TAA-compliant offer for reasonableness or sufficiency before awarding. It merely ensures that the agency must first evaluate TAA-compliant offers without reference to non-TAA-compliant offers before the agency awards the contract.

Defendant's proposed application of the FAR fares no better. Defendant contends that the contracting officer complied with FAR 25.502(a) by first eliminating one nonresponsive offer (Cosette's), then ranking proposals by price, and finally applying FAR 25.502(a)(3). Def. Reply at 14–15 (citing AR 895, 896). According to Defendant, the instruction in FAR 25.502(a)(3) to "use the evaluated price" to determine the best value to the Government meant that the contracting officer was required to conduct a general price evaluation considering both TAA-compliant and non-compliant offers, which the VA did here. *Id.* at 15. That reasoning suffers from two flaws. First, "evaluated price" in FAR 25.502(a)(3) does not, as Defendant suggests, direct a price

reasonableness analysis before evaluating offeror's TAA compliance. Rather, "evaluated price" is a term of art, referencing a domestic offer's price as adjusted under the BAA—for example, by adding the 20–30% evaluation factor. *See* FAR 25.106(b) ("The price of the domestic offer is reasonable if it does not exceed the evaluated price of the low offer after addition of the appropriate evaluation factor."); *see also* FAR 25.504-1 (explaining that the evaluated price of offers is the price of the offer plus a 20 or 30% evaluation factor when the BAA applies). Defendant therefore cannot rely on the term "evaluated price" to support its contention that the FAR required the kind of price reasonableness analysis undertaken here. Second, FAR 25.502(a)(3) only applies "[if] the solicitation specifies award on the basis of factors in addition to cost or price." This Solicitation, however, was a lowest-price, technically acceptable procurement. AR 99. Accordingly, sub-subsection (a)(3) is inapplicable.

In sum, neither party's FAR 25.502-based arguments resolve this case. The regulation neither compels the categorical exclusion of non-TAA-compliant offers as a first step, as Cosette urges, nor authorizes the type of price reasonableness comparison between TAA-compliant and non-compliant offers that Defendant favors. Only the text of the TAA answers the pertinent question here: an agency may award to a non-TAA-compliant offeror when the TAA-compliant offers are "insufficient"—a standard not satisfied by mere price comparison to non-TAA-compliant offers. *See supra* Section I.

### III.    The VA's Actions Were Arbitrary and Capricious

An agency's decision to award a contract must provide a "coherent and reasonable explanation of its exercise of discretion" and should be set aside only if "the award decision had no rational basis." *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (quotation omitted); *Tolliver Grp., Inc. v. United States*, 151 Fed. Cl. 70, 109 (2020) (quoting

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  An agency's price reasonableness decision is arbitrary and capricious when the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or . . . is so implausible that it could not be ascribed to a difference in view of the product of agency expertise." *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).  In addition to violating the TAA and thus being contrary to law, the CO's decision to establish a competitive range among TAA-compliant and non-compliant offers lacked a rational basis.

Cosette asserts that the VA provides no adequate justification for establishing a competitive range determination, and therefore, the competitive range was a pretext to exclude Cosette from the competition.  Pl. MJAR at 26–31.  "A contracting officer has broad discretion in determining competitive range, and such decisions are not disturbed unless clearly unreasonable." *Birch & Davis Int'l, Inc. v. Christopher*, 4 F.3d 970, 973 (Fed. Cir. 1993).  When assessing whether a competitive range determination was arbitrary, capricious, or an abuse of discretion, the Court may look to the entire administrative record. *KSC Boss All., LLC v. United States*, 142 Fed. Cl. 368, 387 (2019).

The Administrative Record here establishes that the contracting officer's decision to establish a competitive range was "clearly unreasonable." *Birch & Davis*, 4 F.3d at 973.  The VA offered three different justifications for its determination, each contradicted by the record or rendered illogical by the procurement's circumstances.

*First*, the VA's reasoning was internally inconsistent.  The Competitive Range Determination cited an "urgent need" for a contract.  AR 1030.  Yet the VA's subsequent Non-

Availability Determination explicitly stated that the acquisition was not urgent.   AR 889.

Additionally, in its acquisition plan, the VA stated that the schedule risk for this procurement was

"low" because the drug was available via the FSS and open market, further contradicting any

urgent need justification.   AR 23.   Such contradictory justifications indicate arbitrary and

capricious action.  *See IBG LLC v. Trading Techs. Int'l, Inc.*, 757 F. App'x 1004, 1008 (Fed. Cir.

2019); *see also Can Softech, Inc. v. United States*, No. 24-670, 2024 WL 4434253, at *6 (Fed. Cl.

Oct. 4, 2024) ("'[I]t is not arbitrary for an agency to not provide detailed explanations of the

reasons an approach is adequate, unless this subjective judgment can be shown to be inconsistently

reached.'") (alteration in original) (quoting *Inspace 21 LLC v. United States*, 128 Fed. Cl. 69, 89

(2016)).

        *Second*, the Non-Availability Determination, which Defendant issued more than a month

after the Competitive Range Determination was made, claimed the competitive range was needed

for "further discussions and final evaluation."  AR 890.  Yet, the VA's claimed need for further

discussions in the procurement appears nowhere in the Competitive Range Determination itself.

*See* AR 893–97 (referencing in the Competitive Range Determination "any further discussions" as

a possibility, rather than an anticipated or present need).  Further, the status of the procurement

suggests that the CO never had any intention of engaging in further discussions—by the time the

range was established, the deadline for Final Proposal Revisions including each offeror's "best

and final pricing" had already passed.  AR 744.  In requesting those revisions, the CO expressly

stated that he was "concluding discussions" on each proposal, strongly indicating there was no

intent to conduct additional discussions following the Competitive Range Decision.  AR 744, 746,

748, 750, 752, 754.  Ultimately, no discussions, in fact, occurred after the range was set.  *See* AR

912–17 (no discussions between Competitive Range Determination and Golden State's Source

Selection as lowest-priced, technically acceptable proposal).

*Third*, the Source Selection Decision stated that "it was determined that a competitive range determination would be made . . . for the purposes of efficiency in reviewing proposals." AR 911. Efficiency can provide a legitimate basis for limiting the number of proposals in active consideration. For example, where an agency faces a large volume of offers requiring complex technical evaluations, narrowing the pool may allow evaluators to focus on the most promising proposals and avoid expending resources on offers with little chance of award. *See Quantico Tactical*, 150 Fed. Cl. at 573. The circumstances here bore none of those hallmarks. At the time the CO decided to establish a competitive range, the VA had received only five timely Final Proposal Revisions. AR 875. Each proposal already included final pricing, and the Solicitation's evaluation scheme was a straightforward Lowest Price Technically Acceptable award methodology. AR 11–14; 895–96. Moreover, the record reflects that Cosette's offer had already been found to meet all the technical evaluation criteria and the terms and conditions listed in the Solicitation prior to the competitive range decision. AR 903. Any time savings from omitting Cosette's price from review would have been negligible. Given the minimal number of proposals, the mechanical nature of the remaining evaluation, and the prior confirmation of Cosette's technical acceptability, it is evident that "efficiency" was not a genuine operational consideration but an after-the-fact rationalization unsupported by any demonstrable benefit to the procurement.

Defendant offers little rebuttal to these points, noting only that agencies are afforded substantial deference in establishing a competitive range and that "[u]nder the FAR, if discussions are to be conducted, a contracting officer has the discretion to establish a competitive range." Def. MJAR at 23. While FAR 15.306(c)(1) provides for the creation of a competitive range when discussions are to occur after its establishment, here, all discussions occurred beforehand. *See*

*supra* at 29.  And while the Court acknowledges the well-established, broad discretion afforded contracting officers in this area, that discretion is not boundless; even under this deferential standard, the VA's decision to and method of establishing a competitive range here was unreasonable.  *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001); *Frawner Corp. v. United States*, 161 Fed. Cl. 420, 441 (2022).

## IV.   Cosette Was Prejudiced by the VA's Actions

Defendant argues that, even if it had committed an error in eliminating Cosette from the procurement process, Cosette cannot prevail here because it has not suffered prejudice.  Def. Reply at 19–20.  A protestor establishes prejudice by showing "that there was a 'substantial chance' it would have received the contract award but for" that error.  *Sys. Stud. & Simulation*, 22 F.4th at 998 (quoting *Bannum*, 404 F.3d at 1353).  In other words, the disappointed bidder must have been "within the zone of active consideration."  *Colonial Press Int'l, Inc. v. United States*, 788 F.3d 1350, 1355 (Fed. Cir. 2015) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996)).  Cosette satisfies this standard.  Its proposal was the only TAA-compliant offer; and without a determination that its offer was insufficient to fulfill the requirements of the Solicitation, it was the sole eligible offeror.  While Defendant asserts that Cosette's price was too high to be considered for award, the record reflects only that the agency deemed Cosette's price too high in comparison to non-TAA-compliant prices—comparisons that cannot lawfully serve as the basis for exclusion.  *Supra* Section I.A.  And while both parties agree that the VA "could have cancelled" the Solicitation rather than award to Cosette, nothing in the Administrative Record indicates that the VA will necessarily adopt that course.  *See* Def. Reply at 19–20; OA Tr. 13:15–16.  It would be improper for the Court to supplement the Administrative Record with either its own

suppositions or with attorney argument, however compelling.  Indeed, it is well-established that *post hoc* assertions in litigation cannot substitute for contemporaneous agency reasoning.  *Dept. of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 22 (2020).  Accordingly, Defendant's counsel's speculation about what the VA might do cannot defeat Cosette's showing of prejudice at this stage.  *See IAP Worldwide Servs., Inc. v. United States*, 160 Fed. Cl. 57, 89–90 (2022) (rejecting government's attempt to show lack of prejudice by relying "upon something that never happened, upon an administrative determination that was never made") (quoting *Bell v. United States*, 366 U.S. 393, 413 (1961)).

## V.    The Court Declines Cosette's Request to Declare its Offer Price Fair and Reasonable.

Having determined that Cosette's offer was impermissibly excluded, Cosette asks this Court to go further and declare that its price is fair and reasonable as a matter of law.  OA Tr. 91:22–93:1; Pl. MJAR at 19–25.  The Court declines Cosette's entreaty.

In support of its position, Cosette contends that its offered price is *per se* fair and reasonable because it complies with the Veterans Health Care Act's (VHCA's) pricing framework.  Pl. MJAR at 20–22.  Under the VHCA, drug manufacturers must enter into pharmaceutical pricing agreements with the VA and list covered drugs on the FSS at prices not exceeding 76% of the non-Federal average manufacturer price.  38 U.S.C. § 8126(a)(2).  Cosette represents that its branded prasugrel tablets qualify as "covered drugs," and it offers them to the VA on its FSS contract at statutorily-capped prices.  Pl. MJAR. at 20; *see also* 38 U.S.C. § 8126(h)(2).  Cosette states that the prices listed in its final offer were lower than the statutory cap, lower than its 2024 FSS prices, and at least 24% lower than the open-market price for prasugrel.  Pl. MJAR at 24.

From this premise Cosette advances two legal theories, neither of which are compelling here.  First, it contends that an offer price at or below a legally mandated cap is, by definition, fair

and reasonable under FAR 15.403-1(c)(2), which provides that "[p]rices set by law or regulation" are "sufficient to set a price." Pl. MJAR at 21. However, Plaintiff's reliance on FAR 15.403-1(c)(2) is misplaced, as that provision merely exempts agencies from obtaining certified cost or pricing data when prices are set by law or regulation. It does not declare such prices *per se* fair and reasonable. In fact, FAR 15.404-1(a)(2) instructs agencies to assess price reasonableness even when certified data is not required, showcasing the difference between certified pricing data and a price reasonableness analysis. As Cosette cites no authority establishing that a price at or below a statutory cap is *per se* fair and reasonable, the Court declines to adopt that view.

Second, Cosette asserts that it is "bedrock procurement law" that FSS prices are presumed fair and reasonable, citing FAR 8.404, which states: "GSA has already determined the prices of supplies and fixed-price services . . . under schedule contracts to be fair and reasonable" and "[t]herefore, ordering activities are not required to make a separate determination of fair and reasonable pricing." Pl. MJAR at 21 (quoting FAR 8.404). This argument has multiple flaws. First, this procurement is not an FSS order, so FAR Subpart 8.4 does not control. FAR 8.403(a) ("Procedures in this subpart apply to—(1) Individual orders for supplies or services placed against [FSS] contracts; and (2) [blanket purchase agreements] established against [FSS] contracts."); *see also Distributed Sols., Inc. v. United States*, 106 Fed. Cl. 1, 15 (2012), *aff'd*, 500 F. App'x 955 (Fed. Cir. 2013) (noting that FAR 8.403(a) is applicable to solicitations under the FSS). Second, even within the FSS framework, FAR 8.404 merely dispenses with a duplicative determination; it does not bind future procurements to such a determination. Third, Cosette's argument was squarely rejected by the Federal Circuit in *Land Shark Shredding, LLC v. United States*, 842 F. App'x 594, 598 (Fed. Cir. 2021). There, the Federal Circuit explained that "nothing requires the contracting officer to defer to the FSS in making the determination that an award could be made

at fair and reasonable prices that offer the best value to the United States." *Id.*  Accordingly, as Cosette has failed to provide support for its contention that its offer price was fair and reasonable as a matter of law, the Court declines to make such a pronouncement here.

## VI.    Injunctive Relief

The Court considers four factors when deciding whether to grant injunctive relief: (1) whether the plaintiff has succeeded on the merits, (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) whether the balance of hardships to the respective parties favors granting an injunction, and (4) whether the public interest is served by granting an injunction.  *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009); *see also Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1312 (Fed. Cir. 2007) (noting that success on the merits is "the most important factor required to enjoin the award of [a] contract").  As discussed above, Cosette's protest succeeds on the merits.  Thus, this Court reviews the other three factors to determine whether injunctive relief is appropriate.

### A.  Cosette Will Suffer Irreparable Harm

Cosette will suffer irreparable harm if injunctive relief is withheld.  "'A party suffers irreparable harm when there is no adequate remedy' in the absence of an injunction." *Frawner Corp. v. United States*, 161 Fed. Cl. 420, 462 (2022) (quoting *CW Gov't Travel, Inc. v. United States*, 61 Fed. Cl. 559, 575 (2004), *aff'd*, 163 F. App'x 853 (Fed. Cir. 2005)).  Courts have recognized that a party suffers irreparable harm when it loses the "opportunity to compete for a contract and secure any resulting profit." *Id.*  Since an award was improperly made to Golden State, Cosette is unable to compete for the award and will potentially lose profits as a result.  Thus, Cosette will suffer irreparable harm.

### B.  The Balance of Hardships Weighs in Favor of an Injunction

The balance of hardships inquiry requires a "consideration of the harm to the [G]overnment." *Frawner Corp.*, 161 Fed. Cl. at 462 (quoting *Overstreet Elec. Co. v. United States*, 47 Fed. Cl. 728, 744 (2000)) (alteration in original).  Here, injunctive relief does not present hardship to the VA.  The VA has entered into a bridge contract with Golden State for the awarded contract price, and thus the drug is fully available to the VA in the interim as it reevaluates how to proceed.  Def. MJAR at 32.  As Defendant's counsel acknowledged during oral argument, "the sky [will not] fall."  OA Tr. 85:2–4.  In contrast, without an injunction, Cosette would still be deprived of the ability to compete for the award.  Accordingly, the balance of hardships weighs in favor of granting an injunction.

### C.  An Injunction Is in the Public Interest

It is axiomatic that "the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." *Overstreet Elec.*, 47 Fed. Cl. at 744.  An injunction preventing performance under an improperly awarded contract will serve the public interest by preserving that honest, open, and fair process.  *Frawner Corp. v. United States*, 161 Fed. Cl. 420 (2022) (citing *PGBA, LLC v. United States*, 57 Fed. Cl. 655, 663 (2003)).  Defendant contends that an injunction would force the Government to unnecessarily spend an additional $██████ to procure a TAA-compliant version of the drug, which is not in the public interest.  However, any award must comply with the law; as discussed above, the current award fails in that regard.  Further, as noted, in passing the TAA, Congress contemplated the tradeoffs in increasing procurement price and determined the tradeoff to be worthwhile.

Importantly, as Defendant stated in its brief and as Cosette's counsel agreed, an injunction would not force the VA to award the contract to Cosette at such a high price; all agree that the VA

may cancel the Solicitation and procure the drug on the open market at a lower price rather than award the contract to Cosette at its offer price. *See* Reply at 19–20; OA Tr. 13:15–17, 14:5–6. All agree such an action would be proper and would comport with the public interest. Accordingly, the public interest factor weighs in favor of an injunction.

### D. Scope of Injunction

As all four factors weigh in Plaintiff's favor, this Court finds entry of an injunction appropriate. "[T]he Court of Federal Claims has broad equitable powers to fashion an appropriate remedy." *Turner Constr. Co., Inc. v. United States*, 645 F.3d 1377, 1388 (Fed. Cir. 2011). Indeed, the Tucker Act empowers this Court to "award any relief that [it] considers proper." 28 U.S.C. § 1491(b)(2). Concerning the scope of injunctive relief, the Court enjoins Defendant from awarding or proceeding with any award under the Solicitation to a non-TAA-compliant offeror unless the Defendant (i) invokes the TAA's waiver provision, or (ii) determines, consistent with this Memorandum and Order and with sufficient explanation, that Cosette's offer is otherwise insufficient to meet the requirements of the VA under the terms of the Solicitation and applicable law. In determining the sufficiency of Cosette's TAA-compliant offer, the VA is prohibited from basing such a determination on a comparison between Cosette's price and the price of non-TAA-compliant products; similarly, the VA cannot exclude Cosette from a competitive range based on such an improper comparison to non-TAA-compliant offers.

To be clear, as reflected above, the Court is not ordering the VA to procure prasugrel from Cosette at its offer price; as noted, and as all partes agree, the VA may opt to cancel the Solicitation and, for example, procure the drug at a lower price via the open market instead. AR 15; OA Tr. 13:15–17 (Plaintiff agreeing VA may turn to open market); OA 38:11–14 (Defendant agreeing).

36

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 27) is **GRANTED IN PART** and Defendant's Cross-Motion for Judgment on the Administrative Record (ECF No. 29) is **DENIED IN PART**.  As noted, the Court also **GRANTS** Plaintiff's unopposed Motion for Judicial Notice (ECF No. 42), for good cause shown.

The VA is **ENJOINED** from proceeding with any award under the current Solicitation to a non-TAA-compliant offeror.  Should the VA opt to proceed under the current Solicitation (as opposed to purchasing the drug on the open market), then consistent with this Court's Memorandum and Order, it may not deem Cosette's offer insufficient on the basis that (i) its price is unreasonable based on a comparison to non-TAA-compliant offerors' prices, or (ii) it is excluded from the competitive range based on a price comparison to non-TAA-compliant offers.  The Court **DENIES** Cosette's request to declare its high offer price fair and reasonable as a matter of law.

The Clerk of Court is **DIRECTED** to enter Judgment accordingly and mark this case closed.

The parties are directed to **CONFER** and **FILE** a Notice by November 14, 2025, attaching a proposed, public version of this sealed Memorandum and Order, with any competition-sensitive or otherwise protected information redacted.

IT IS SO ORDERED.



*Eleni M. Roumel*
ELENI M. ROUMEL
Judge

October 31, 2025
Washington, D.C.